# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# EASTERN DIVISION

| | |
|---|---|
| DANA PERSON FOR D.P., A MINOR CHILD, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>KILOLO KIJAKAZI, Acting Commissioner of Social Security, )<br>)<br>Defendant. ) | Civil Action Number<br>**1:20-CV-01185-AKK** |

## MEMORANDUM OPINION

Dana Person brings this action on behalf of her minor son, D.P., pursuant to 42 U.S.C. §§ 1383(c)(3) and 405(g), seeking review of the final adverse decision of the Commissioner of the Social Security Administration under the Social Security Act. After careful review, this court finds that the decision of the Administrative Law Judge, which has become the final decision of the Commissioner, was not predicated on a fully developed record because the ALJ failed to address D.P.'s formal test scores. Thus, for the reasons below, the court reverses the decision denying benefits and remands the case for further proceedings.

### I.

Person applied for Social Security benefits on behalf of her then-nine-year-old son, D.P., on July 6, 2018, due to her son's seizures, asthma, and attention-

deficit/hyperactivity disorder ("ADHD").  Doc. 19 at 1; R. 166.  This claim was denied on October 23, 2018, R. 80, and Person requested a hearing thereafter, R. 87. Person, D.P., and their attorney appeared at a hearing before an ALJ, who subsequently rendered a decision denying benefits.  *See* R. 24, 34.  Following the ALJ's decision, Person sought review by the SSA Appeals Council, which denied her request and rendered the ALJ's decision the final decision of the Commissioner. R. 1.  Person subsequently filed this petition for judicial review.

## II.

This court's review is limited to determining whether the record contains substantial evidence to sustain the ALJ's decision and whether the ALJ applied the correct legal standards.  *See* 42 U.S.C. § 405(g); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  Specifically, under 42 U.S.C. §§ 405(g) and 1383(c), the Commissioner's "factual findings are conclusive if supported by 'substantial evidence.'"  *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  In its review, the court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for the Commissioner's.  *Id.*  Rather, the court must review the final decision in its entirety to determine whether it is "'reasonable and supported by substantial evidence.'"  *Id.* (quoting *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* (quoting *Bloodsworth*, 703 F.2d at 1239). "[T]he threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). Rather, substantial evidence falls somewhere between a "scintilla" and a "preponderance of evidence." *Martin*, 894 F.2d at 1529. If substantial evidence supports the Commissioner's factual findings, then the court must affirm, even if the evidence preponderates against those findings. *See id.* However, this "does not yield automatic affirmance," *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); reviewing courts are not to act as "automatons," *Bloodsworth*, 703 F.2d at 1239 (internal quotations omitted). Courts review legal conclusions, on the other hand, de novo. *Martin*, 894 F.2d at 1529.

**III.**

The SSA considers a claimant under the age of 18 to be disabled if the claimant "[has] a medically determinable physical or mental impairment or combination of impairments that causes marked and severe functional limitations, and that can be expected to cause death or that has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.906. The regulations define "marked and severe functional limitations" in terms of "listing-level severity." 20 C.F.R. §§ 416.902, 416.906, 416.924(a), 416.926a(a). The regulations also establish a three-step test to determine whether a child is disabled:

3

> Under the first step, the ALJ considers whether the child has engaged in any substantial gainful activity. At step two, the ALJ considers whether the child has an impairment or combination of impairments that is severe. At step three, the ALJ must decide whether the child's impairment meets, medically equals, or functionally equals a listed impairment.

*Coleman ex rel. J.K.C. v. Comm'r of Soc. Sec.*, 454 F. App'x 751, 752 (11th Cir. 2011) (internal citations omitted); *see* 20 C.F.R. § 416.924.[1]

If the child has a severe impairment or combination of impairments that does not meet or medically equal any listing, the ALJ determines whether the impairment or combination of impairments "functionally equals" the listings. 20 C.F.R. § 416.926a(a). To do this, the ALJ considers the child's functioning in six "domains": (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1). If the ALJ determines that the child has "marked" limitations in two of these domains or an "extreme" limitation in one domain, the child's impairment or impairments are of listing-level severity. *Id.* § 416.926a(d). "An 'extreme' rating is reserved for 'the worst limitations,' ones that interfere 'very seriously' with the child's ability to independently initiate, sustain, or complete

---

[1] Substantial activity "involves doing significant physical or mental activities," and gainful activity means "work activity that you do for pay or profit," regardless of whether profit is realized. 20 C.F.R. § 416.972(a), (b). "[A]ctivities like taking care of yourself, household tasks, hobbies, therapy, school attendance, club activities or social programs" are generally not substantial gainful activity. *Id.* § 416.972(c).

4

activities." *Beavers v. Comm'r of Soc. Sec.*, 601 F. App'x 818, 821 (11th Cir. 2015) (citing 20 C.F.R. § 416.926(a)). "A child's limitation is 'marked' if it is 'less than extreme,' but 'more than moderate' and 'interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities.'" *Id.*

To render these conclusions, the ALJ considers "all evidence in [the child's] case record," including "information from medical sources (such as [the child's] pediatrician or other physician; psychologist; qualified speech-language pathologist; and physical, occupational, and rehabilitation therapists) and nonmedical sources (such as [the child's] parents, teachers, and other people who know [the child])." 20 C.F.R. § 416.924a(a). Medical evidence may include "formal testing that provides information about [the child's] development or functioning in terms of percentiles, percentages of delay, or age or grade equivalents," and the ALJ evaluates these scores together with information like reports of classroom performance and observations by teachers. *Id.* § 416.926a(e). The ALJ also considers whether the child does activities that other children that age typically do, how much assistance the child requires from family members or teachers, and the combined effects of multiple impairments on the child's day-to-day functioning. *Id.* § 416.924a(b).

Finally, the ALJ considers symptoms, including pain, and the extent to which the child's symptoms can "reasonably be accepted as consistent with the objective medical evidence and other evidence." *Id.* § 416.929(a). The regulations require

5

that there be "objective medical evidence from an acceptable medical source that shows [the child has] a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged" and that the ALJ consider statements about the intensity and persistence of [the child's] pain or other symptoms "which may reasonably be accepted as consistent with the medical signs and laboratory findings." *Id.* The ALJ uses this evidence to decide how symptoms affect the child's functioning. *Id.* If the impairments do not meet, medically equal, or functionally equal one of the listings, a finding of not disabled is reached, and the claim is denied.

## IV.

In this case, the ALJ determined at Step One that D.P., a school-aged child, had not engaged in substantial gainful activity since the date his mother filed his application for benefits. R. 14. At Step Two, the ALJ found that D.P. suffered from seizures, asthma, and ADHD, all constituting severe impairments. *Id.* (citing 20 C.F.R. § 416.924(c)). In particular, the ALJ stated that D.P.'s impairments "constitute[d] more than a slight abnormality and have caused [D.P.] more than a minimal functional limitation for a continuous period of 12 months." *Id.* At Step Three, the ALJ determined that D.P. did not have an impairment or combination of impairments that met or medically equaled the severity of any listing. *Id.* In reaching this conclusion, the ALJ reviewed the listings for neurodevelopmental

disorders, asthma, and epilepsy and found that D.P.'s impairments did not satisfy the required elements for severity of these conditions. R. 14–15.[2]

Thus, the ALJ assessed whether D.P. had an impairment or impairments that functionally equaled the severity of the listings. R. 15. The ALJ began by reviewing function reports of D.P. prepared by D.P.'s parents. R. 16.[3] Next, the ALJ discussed some of D.P.'s treatment, including transportation to school in a special-needs bus due to seizures; tutoring; and medication for seizures, ADHD, and asthma. *Id.* The ALJ then turned to the hearing testimony. *See id.* At the hearing, D.P. acknowledged that he "[did] not like school [] and perform[ed] poorly" and that he fought with classmates. *Id.*; *see also* R. 39, 45–46. D.P.'s mother testified that he had absences caused by his seizures every other day, experienced daily headaches due to his seizure medication, and struggled with tasks in class and at home, and that his school "seldom" provided the extra help he was supposed to receive. R. 45–51.

In light of this evidence, the ALJ concluded that D.P.'s "medically determinable impairments could reasonably be expected to produce some of the

---

[2] Specifically, the ALJ noted that the record "fail[ed] to reflect an extreme limitation of one, or a marked limitation of two, of the areas of mental functioning"; "[did] not include 3 hospitalizations within a 12-month period, at least 30 days apart, and lasting at least 48 hours" for asthma; and "[did] not show a seizure occurring at least once a week for at least 3 consecutive months, despite adherence to prescribed treatment." R. 14–15.

[3] The ALJ noted that both parents indicated D.P. had "limitations in his ability to communicate," one or few limitations in learning, limitations in his behavior with others, limitations with personal needs, and inabilities with respect to paying attention and completing tasks. R. 16.

alleged symptoms." R. 17.  However, the ALJ stated that "the statements concerning the intensity, persistence and limiting effects of these symptoms" were "inconsistent because they [were] unsupported by the evidence of record." *Id.*  Here, the ALJ looked to medical reports from Hamo Neurology, which she said indicated "no seizure activity since the prior visit" and instead noted normal development, no learning disability, and brief spells of 5–25 seconds with post-spell tiredness. *Id.* She also looked at records from Ashland Family Care, which she said reported trouble with in-school behavior but fewer seizures; Children's Hospital of Alabama, which she said reported continued, short seizures that were "90% better since switching [medications]" and no "focal motor deficits"; and Alta Pointe Mental Health, which she said evidenced D.P.'s disruptive class behavior but good seizure control and mental and academic improvement through treatment. *Id.* at 17–18.

The ALJ next turned to opinions from a psychiatrist, a pediatrician, and several of D.P.'s teachers. *Id.* at 18.  The ALJ discounted the psychiatrist's and pediatrician's October 2018 assessment because "the medical evidence of record in the file since this assessment indicate[d] more limitations, notably in the first domain." *Id.*  The ALJ then discussed questionnaires filled out by D.P.'s reading and language teacher, science and social studies teacher, and math and writing teacher that all indicated "very serious," "serious," "obvious," and "slight" problems

8

with regard to D.P.'s acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for himself.  R. 18–19.

Finally, the ALJ turned directly to the six domains of functional equivalence. R. 19.  Regarding "acquiring and using information," the ALJ concluded that D.P. had a "less than marked limitation."  *Id.*  The ALJ noted that D.P. had struggled academically and was referred to Alta Pointe based on test results, poor focus, and concentration.  *Id.*  However, the ALJ cited records from 2019 she said indicated that D.P.'s medications "were working," "he was doing well academically," and "his irritability had improved."  *Id.* (citing R. 629–31).  Next, as to the "attending and completing tasks" domain, the ALJ also concluded that D.P. had a "less than marked limitation," for a similar reason: though his teachers had noted limitations in this area, records from 2019 indicated improvement.  *See* R. 21.  The ALJ found also a "less than marked limitation" in D.P.'s "interacting and relating with others" because, though D.P. reported being bullied, his teachers indicated "a single serious issue, but mostly obvious or slight issues in this area."  R. 22.

Regarding "moving about and manipulating objects," the ALJ concluded that D.P. had no limitations, as neither his doctors nor his teachers reported issues in this area.  *Id.*  Likewise, the ALJ concluded D.P. had no limitations "caring for [himself]" because D.P.'s doctors did not report any issues and his teachers reported only slight or no problems.  *Id.*  Finally, as to the "health and physical well-being" domain, the

ALJ concluded that D.P. had a "less than marked limitation" because his asthma and seizures were either under control or receiving effective treatment. R. 24. Taken together, the ALJ concluded that D.P. did not have an impairment or combination of impairments that resulted in either "marked" limitations in two domains or an "extreme" limitation in one domain, meaning D.P. was not disabled. *See id.*

## V.

Person asserts that the ALJ's decision is not supported by substantial evidence or otherwise warrants reversal and remand because the ALJ failed to consider (1) the significance of D.P.'s low formal test scores and (2) the assessments of D.P.'s teachers, who reported that he had multiple "serious" and "very serious" impairments. Doc. 19 at 14–16. The court addresses these contentions in turn.

### A.

The court turns first to Person's contention that the ALJ failed to consider "[t]he significance of the[] low scores" that D.P. earned on reading-level, math-level, and writing-level tests; the Adaptive Behavior Assessment; the Behavioral Symptoms Index; and an IQ test. Doc. 19 at 14. The court notes as an initial matter that the ALJ "will not rely on any test score alone." 20 C.F.R. § 416.926a(e)(4). However, the ALJ is instructed to "consider [the child's] test scores together with the other information [the SSA] has about [the child's] functioning, including reports

of classroom performance and the observations of school personnel and others." *Id.*[4] And the regulations state that the ALJ, when declining to rely on a child's test scores, "will explain [the ALJ's] reasoning for doing so in [the child's] case record or in [the ALJ's] decision." *Id.* The ALJ failed to do so in this case.

D.P. took standardized assessments in reading, math, and written language in February 2019 and received testing for special education, including an IQ test, in January or February 2019. *See* R. 238–41. His scores on reading and math tests were reported as "below average," and his score on the written-language test was reported as "low." R. 238. D.P. was administered an Adaptive Behavior Rating Scale in January 2019 that indicated a below-average general score, with a low conceptual score, a below-average social score, and an average practical score. R. 240. D.P. was also administered a Behavior Rating Scale that indicated "clinically significant" behavioral symptoms, including hyperactivity, aggression, conduct problems, anxiety, depression, somatization, attention problems, and learning problems. *Id.* D.P.'s Weschler Intelligence Scale returned an IQ score of 73, described as "very low." *Id.* However, a record-preparer at his school wrote in

---

[4] The ALJ may conclude that a child has a marked or extreme limitation even when the child's test score is slightly higher than the regulation cutoffs for standardized tests—two standard deviations or more below the mean for "marked," or three standard deviations or more below the mean for "extreme"—if there is evidence that the child's day-to-day functioning is seriously or very seriously limited. 20 C.F.R. § 416.926a(e)(4). Conversely, the ALJ may conclude that a child does not have a marked or extreme limitation, even if the child's test scores fall within these cutoffs, if evidence shows that the child's day-to-day functioning is not seriously or very seriously limited. *Id.*

September 2019 that, although D.P.'s scores "indicate[d] that he [was] below average, based on his IQ and achievement, he [was] functioning within his ability and [did] not meet Alabama Administrative Code criteria for Special Education Services." R. 239.

In her decision denying benefits, the ALJ did not reference these tests. The SSA acknowledges this but argues that the ALJ implicitly considered the scores in reaching her conclusion:

> [W]hile the ALJ did not explicitly discuss the significance of the scores, the individuals for whom the testing was conducted did consider the significance of the scores. The ALJ used all of this information together with the other evidence in the record to assess the level of [D.P.'s] limitations in each of the functional areas as less than marked.

Doc. 22 at 7 (internal citations omitted). However, the court does not discern in the ALJ's decision that the ALJ directly considered the test scores D.P. received. Rather, for the two domains in which D.P. had the largest body of evidence to support his limitations—"acquiring and using information" and "attending and completing tasks"—neither the ALJ's written decision nor the hearing transcript state how the specific test scores were factored into, or explained away in, the analysis.[5]

---

[5] During the hearing, for example, the ALJ and D.P.'s mother briefly mentioned D.P.'s IQ test, but without discussion or explanation about how the other tests may have specifically indicated his limitations (if at all). R. 43. The hearing transcript states, in relevant part:

> "Q [ALJ]: Okay. What are the issues – is this the first year [D.P.'s] gotten some special education?

"Acquiring and using information" refers to how well the child acquires and learns information and how well the child uses the information learned. 20 C.F.R. § 416.926a(g). The ALJ stated that "the record clearly indicate[d] that [D.P.] has had limitations in this functional area, as school records demonstrate[d] that he has struggled academically." R. 20. One mention of test results appears in the ALJ's statements about D.P.'s Alta Pointe records, where the ALJ referenced D.P.'s referral to Alta Pointe based on test results, in-class behavior, poor focus and concentration, and inability to complete tasks. R. 17, 20. The ALJ cited D.P.'s school records for the proposition that D.P. "has struggled academically," but the ALJ concluded that D.P. did not have a marked limitation in domain one because of improvement in his May 2019 Alta Pointe records without discussion of his testing. R. 20.

"Attending and completing tasks" refers to how well the child is able to focus and maintain attention; begin, carry through, and finish activities; avoid impulsive thinking; and manage time. *Holland on behalf of West v. Comm'r of Soc. Sec.*, 842 F. App'x 344, 348 (11th Cir. 2021) (citing 20 C.F.R. § 416.926a(h)). The ALJ cited

---

A [Person]: Well, we're not getting special education. He's only on –
Q: Are you on a 504?
A: No, they said he didn't qualify for it.
Q: Okay. Not even a 504? Okay. Because his I.Q. is higher than his other issues, is that it?
A: Undoubtedly."

*Id.*

the opinions of D.P.'s psychiatrist and pediatrician and questionnaires completed by D.P.'s teachers that suggested D.P. had limitations in this functional area. R. 21. But the ALJ concluded that, because of D.P.'s 2019 Alta Pointe assessments indicating that his "medications were working" and he was "doing well academically," D.P. did not have a marked limitation in this domain. *Id.*

The May 2019 Alta Pointe records do state that D.P. "did well enough academically to pass all his subjects," and that D.P.'s mother "[was] pleased" with his responses to medication. R. 567. The July 2019 Alta Pointe records indicate "positive" reports to D.P.'s medication. R. 562. But they also indicate resulting problems with D.P.'s appetite that resulted in a "decreased dosage" of his medication. R. 562. Moreover, a July 2019 visit to Children's Hospital of Alabama that reported an improvement in D.P.'s seizure activity also indicated that D.P.'s mother "was concerned that [D.P.] barely passed 4th grade, and [thought] he had more trouble in this past year than the year before." R. 541.

The court is mindful that it is not to reconsider the facts, reevaluate the evidence, or substitute its judgment for the ALJ's. *Martin*, 894 F.2d at 1529. The court also recognizes that some evidence in the record supports the ALJ's conclusion that D.P. experienced less-than-marked limitations in at least a few domains. *See*

*Holland on behalf of West*, 842 F. App'x at 348.[6] However, when an ALJ fails to consider the significance of a child-claimant's formal test scores, this generally amounts to a "failure to develop a full and fair record" that warrants remand for further consideration. *See, e.g.*, *Turner ex rel. Turner v. Barnhart*, 377 F. Supp. 2d 1165, 1168–69 (M.D. Ala. 2005); *Zayas o/b/o J.X.A. v. Comm'r of Soc. Sec.*, Case No. 8:18-CV-2918, 2020 WL 487153, at *5–6 (M.D. Fla. Jan. 30, 2020); *Borgens o/b/o Borgens v. Halter*, 164 F. Supp. 2d 1309, 1312–13 (M.D. Fla. 2001). And, because the ALJ failed to address a variety of formal tests that may implicate and reinforce D.P.'s limitations, especially in the domains of "acquiring and using information" and "attending and completing tasks," remand is warranted here so the ALJ can consider D.P.'s limitations, if any, in light of his formal testing. Whether the formal test scores are sufficient to change the ALJ's ultimate finding is for the ALJ to decide.

B.

Person also maintains that the ALJ failed to consider "[t]he great significance of the teacher evaluations," in that the ALJ did not conclude D.P. had marked or

---

[6] In *Holland on behalf of West*, the Eleventh Circuit affirmed the ALJ's conclusion that the child-claimant had no or less-than-marked limitations regarding "attending and completing tasks." 842 F. App'x at 348. There, the ALJ "acknowledged that difficulties in this domain are inherent with ADHD and noted that [the child's] difficulties manifested as fidgeting, difficulty concentrating, and disruptive behaviors at school." *Id.* However, the ALJ noted that the child "achieved passing grades without special education services and was able to complete school assignments and household chores, albeit with prompts." *Id.*

extreme impairments based on his teachers' reports of "very serious" and "serious" limitations. Doc. 19 at 14–16. This argument, however, is unavailing.

The regulations direct the ALJ to "consider [the child's] test scores together with the other information [the SSA] has about [the child's] functioning, including reports of classroom performance and the observations of school personnel and others." 20 C.F.R. § 416.926a(e)(4). However, categories of issues or observations listed within a school-personnel questionnaire may not necessarily correspond to the "less than marked," "marked," or "extreme" ratings used in the Social Security regulations. *See Beavers*, 601 F. App'x at 823. Moreover, whether a child has impairments that functionally equal the listings is a decision that rests with the ALJ and cannot be determined by the conclusions of the child's teachers. *See* 20 C.F.R. §§ 404.1520b(c), 416.920b(c).

Here, the ALJ marched through three questionnaires prepared by D.P.'s teachers. R. 18–19. The ALJ reviewed these evaluations "in the aggregate," acknowledged that the teachers noted "very serious" and "serious" problems in the childhood domains denoted on the questionnaires—particularly in "acquiring and using information" and "attending and completing tasks"—and determined that the teachers' input was persuasive. *Id.* The teachers indeed marked very serious and serious problems in D.P.'s ability to acquire and use information and attend and complete tasks. *See, e.g.*, R. 244–46. But on these forms, the teachers also gave

16

context for their numerical assessments, writing in their comments that D.P. "get[s] distracted easily" and "has a hard time staying on task" but also "functions independently," "follows oral instructions with no problems," and "controls his behavior most of the time." *See* R. 244–66. Therefore, the ALJ did consider the evaluations of D.P.'s teachers, and it was within her discretion to determine whether their evaluations evidenced limitations.

## VI.

The court concludes that the ALJ failed to address D.P.'s formal test scores, which amounts to a "failure to develop a full and fair record." *See, e.g.*, *Zayas o/b/o J.X.A.*, 2020 WL 487153, at *5–6. Therefore, the Commissioner's final decision is **REVERSED**, and the case is **REMANDED** for further consideration. A separate order in accordance with the memorandum of decision will be entered.

**DONE** the 16th day of September, 2021.

_____
**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE